**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ARSEMUS WRIGHT and
MARQUETTA WRIGHT,

      Plaintiffs,                         Case No. 12-15379

v.                                     Hon. Gerald E. Rosen

BLOOMFIELD TOWNSHIP, SGT. HARSHBERGER,
OFFICER WEISE, OFFICER KOLLMAN, OFFICER
HESS, OFFICER SMITH, OFFICER MONKONNEN,
OFFICER MONTI, SGT. TSCHUDIN, and DETECTIVE
DWAYNE BARKER,

      Defendants.
_____/

**OPINION AND ORDER REGARDING**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____October 30, 2014_____

PRESENT:  Honorable Gerald E. Rosen
                    Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiffs Arsemus and Marquetta Wright commenced this action in this Court on

December 7, 2012, asserting federal claims under 42 U.S.C. § 1983 and a variety of state-

law claims against Bloomfield Township and a number of officers of the Bloomfield

Township Police Department arising from a December 4, 2011 incident in which certain

of the Defendant police officers entered Plaintiffs' home without a warrant and allegedly

used excessive force on Mr. Wright while investigating a report of a domestic disturbance. This Court's subject matter jurisdiction rests upon Plaintiffs' assertion of claims arising under federal law. *See* 28 U.S.C. § 1331.

Through the present motion, the Defendant law enforcement officers and Bloomfield Township seek an award of summary judgment in their favor on each of the claims asserted against them in Plaintiffs' complaint. In support of their motion, Defendants argue primarily (i) that the warrantless entry into Plaintiffs' home was justified by exigent circumstances, (ii) that the force used by two of the Defendant police officers to subdue and arrest Mr. Wright was reasonable, (iii) that, in the alternative, the two Defendant officers who initially entered Plaintiffs' home and handcuffed him are shielded from liability by qualified immunity, (iv) that Plaintiffs have failed as a matter of law to establish a basis for imposing liability on the Defendant Township, and (v) that Plaintiffs' state law claims fail on various grounds. In response, Plaintiffs contend (i) that they have identified issues of fact as to the lawfulness of the warrantless entry into their home and the reasonableness of the force used by the Defendant officers against Mr. Wright following this entry,[1] (ii) that qualified immunity is not available to the two Defendant officers who made the initial entry into their home and handcuffed and used a taser on Mr. Wright, (iii) that the Defendant Township is subject to liability for its

---

[1]Plaintiffs concede, however, that only the two officers who initially entered their home and handcuffed Mr. Wright — Officers Weise and Kollman — are subject to liability for the warrantless entry and the alleged use of excessive force against Mr. Wright, and that the record fails to establish a basis for charging the remaining Defendant officers with liability for these alleged constitutional violations.

deficient training or supervision of its officers, and (iv) that issues of fact preclude an award of summary judgment in favor of the Defendant officers on Plaintiffs' state-law claims, with the exception of their claim of gross negligence.[2]

Defendants' motion has been fully briefed by the parties. Having reviewed the parties' briefs and their accompanying exhibits, as well as the remainder of the record, the Court finds that the relevant allegations, facts, and legal issues are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendants' motion "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on this motion.

## II.  FACTUAL BACKGROUND

The facts underlying the December 4, 2011 warrantless entry into Plaintiffs' home and the ensuing arrest of Mr. Wright are the subject of considerable disagreement and dispute among the parties. In accordance with the present, summary judgment posture of this case, the following account is based on a view of the record in a light most favorable to Plaintiffs as the non-moving parties.

On Sunday, December 4, 2011 at approximately 5:42 p.m., the Bloomfield Township Police Department received a 911 call reporting an ongoing argument between a couple in a neighboring apartment. The caller gave her first name, complained of the

---

[2]To the extent that Plaintiffs have asserted any state-law claims against the Defendant Township, they agree that these claims are subject to dismissal.

couple's yelling and use of profanity, and expressed her concern for the couple's young children. The caller further reported having heard what she believed was a slap, but told the 911 dispatcher that she heard "no beating." (Defendants' Motion, Ex. 1, 911 Call Recordings.) The caller advised the dispatcher that this sort of loud arguing by the neighboring couple had been a regular occurrence. Two of the Defendant officers, Officers John Weise and Jason Kollman, were dispatched to the scene, and advised of a "possible Domestic Violence in progress." (Defendants' Motion, Ex. 2, Police Report at 5.)

Plaintiffs Arsemus and Marquetta Wright have testified that on the Sunday afternoon in question, they and their two young children, who were three and six years old at the time, were at home in their Bloomfield Township apartment when they got into a three or four minute argument about cleaning the apartment. The Wrights have acknowledged raising their voices and yelling during this argument, but Mrs. Wright denied that either of them used profanity or swear words, (*see* Plaintiffs' Response, Ex. A, M. Wright Dep. at 11), and Mr. Wright has testified that there was no hitting or physical contact during this argument, (*see* Plaintiffs' Response, Ex. B, A. Wright Dep. at 43-45). At the conclusion of this argument, Mr. Wright went to his bedroom to watch television, and Mrs. Wright began vacuuming the apartment.

Officers Kollman and Weise have testified that as they approached Plaintiffs' residence, they could hear yelling from the apartment. (*See* Defendants' Motion, Ex. 3, Kollman Dep. at 61-62; Ex. 4, Weise Dep. at 97-99.) Plaintiffs, however, have denied

4

that they were still arguing by the time the officers arrived at their door.  (*See* A. Wright Dep. at 45; M. Wright Dep. at 12.)[3]  Instead, Mr. Wright testified that as he sat in his bedroom, he heard rapid pounding on the door and went to answer it.  Upon looking through a peephole in the door, Mr. Wright observed two individuals in uniforms and asked who they were, and Officers Kollman and Weise responded that they were police officers.

After learning that the uniformed individuals outside his door were police officers, Mr. Wright opened the door about a foot and a half or two feet and asked the officers if there was a problem or whether something was wrong.  (*See* A. Wright Dep. at 48-50.)[4] Upon opening the door, Mr. Wright placed his foot under it to keep the officers from entering, (*see* A. Wright Dep. at 53-54), and Officer Kollman likewise placed his foot in the doorway to prevent Mr. Wright from closing the door, (*see* Kollman Dep. at 75-76). Officer Kollman testified that he could see Mrs. Wright and the Wrights' two children through the doorway, (*see* 1/17/2012 Trial Tr. at 65), and Officer Weise similarly testified that he could see Mrs. Wright and that she did not appear to be agitated or injured, (*see id.* at 86; Weise Dep. at 109).  The officers advised Mr. Wright that there was a report of a

---

[3]Plaintiffs note that in a subsequent criminal proceeding brought against Mr. Wright arising from the December 4, 2011 incident at the Wrights' apartment, a prosecutor seemingly acknowledged at a pretrial hearing that the Wrights were not yelling when the officers arrived at their apartment.  (*See* Plaintiffs' Response, Ex. E, 12/13/2011 Pretrial Hearing Tr. at 5.)

[4]Although Officer Kollman testified at his deposition that Mr. Wright opened the door "only . . . about six inches," (Kollman Dep. at 66), Officer Weise testified at Mr. Wright's criminal trial that Mr. Wright opened the door about two or three feet, (*see* Plaintiffs' Response, Ex. H, 1/17/2012 Trial Tr. at 75).

5

disturbance at his apartment, but Mr. Wright responded that "there was nothing going on here." (A. Wright Dep. at 51.) The officers then asked if they could enter the Wrights' apartment, and Mr. Wright stated that they could not, reasoning that "there was no disturbance." (*Id.* at 51.) When the officers insisted that they were coming in and Mr. Wright again responded that they could not, he asked what the officers would do if he closed the door, and the officers warned him that they were "going to knock the door down." (*Id.* at 52.)[5]

At that point, the officers began pushing on the door, while Mr. Wright attempted to hold the door in place so that the officers could not enter. (*See* A. Wright Dep. at 54-55.) Once the officers made it clear that they intended to forcibly enter the apartment, Mr. Wright stepped back from the doorway and put his hands in the air, near his head. (*See id.* at 55, 197, 200.) Upon entering the residence, the officers ordered Mr. Wright to get down on the ground, but he refused and instead asked, "Get down on the ground for what?" (*Id.* at 56.) At that point, the officers each grabbed one of Mr. Wright's arms by the wrist and attempted to pull his arms down while repeating their command that he get down on the ground, but Mr. Wright continued to refuse and asked the officers, "[W]hat's

---

[5]The officers testified that during their initial discussion with Mr. Wright, they gave him the option of stepping outside the apartment and speaking to them about the report of a domestic disturbance. (*See* Weise Dep. at 105-06; Kollman Dep. at 68, 71.) Mr. Wright, however, denied that the officers gave him the option of speaking with them in the hallway. (*See* A. Wright Dep. at 54.) In addition, both officers conceded that they did not ask Mrs. Wright to come out of the apartment so that they could speak to her. (*See* Weise Dep. at 113, 117; Kollman Dep. at 71.)

wrong?" (*Id.* at 57-60.)[6]

When the officers failed to secure Mr. Wright's compliance with their order to get down on the ground, one of the officers struck Mr. Wright in the side with his knee at least twice. (*See* A. Wright Dep. at 65-67; *see also* Kollman Dep. at 82, 84; Weise Dep. at 126.) When this had no effect, the officers then warned Mr. Wright that they were going to tase him if he "wasn't going to listen about getting down on the ground," and Mr. Wright responded by continuing to move around and stating, "You can tase me, I want to feel what it feel[s] like anyway, and if you do that, I [am] going to sue." (A. Wright Dep. at 61.) While the officers kept their hold on Mr. Wright's arms, they deployed a taser "three or four times" to his back, which he described as "painful," but Mr. Wright still remained on his feet. (*Id.* at 67-71, 73, 75.) The officers then used their taser on Mr. Wright's leg, and he stated at that point, "Okay . . . , I'm going to get down on the ground." (*Id.* at 71-72.) Even then, however, Mr. Wright testified that the officers did not allow him to get down to the floor on his own, but instead "tr[ied] to sling [him]

_____

[6]Again, the officers have testified differently on this point, stating that immediately after they grabbed Mr. Wright's wrists, they ordered him to put his hands behind his back and stop resisting. (*See* Kollman Dep. at 79-81; Weise Dep. at 120-22.) The officers further testified that Mr. Wright resisted this effort by tensing his arms so that they would not go behind his back. (*See* Kollman Dep. at 83-84; Weise Dep. at 123-24.) Mr. Wright, in contrast, testified that the officers did not ask him to put his hands behind his back before they grabbed his arms, and he likewise denied that the officers were trying to get him to put his hands behind his back. (*See* A. Wright Dep. at 58-59, 197-98.) Instead, he could only recall their commands that he get down on the ground. (*See id.* at 59-60.) More specifically, Mr. Wright testified that the officers "didn't try to pull my arms down and say, Mr. Wright, could you calm down, you know, we're not going to handcuff you or anything;" rather, "[t]hey were just ready to throw me on the ground, that's all." (*Id.* at 64.)

around" and "slammed" him on the ground.  (*Id.* at 73, 76, 81-85.)  Mr. Wright stated that

throughout this entire episode, he never made any threatening gestures toward the

officers, he never kicked or punched them, he took no action in response when the

officers kneed and tased him, and he was unarmed and there were no weapons in the

apartment.  (*See id.* at 198-99.)[7]

After the officers took Mr. Wright down to the ground, they handcuffed him,

picked him up off the floor, and ordered him to have a seat on the couch.  (*See id.* at 87.)

At this point, five of the Defendant officers — Officers Hess, Smith, Monkonnen, and

Monti, as well as Sergeant Tschudin — arrived at Plaintiffs' apartment, but there is no

evidence that these officers participated in the initial entry into the Wrights' apartment or

the ensuing use of force against Mr. Wright.[8]  Officers Weise testified that Mr. Wright

was offered medical attention but declined this offer.  (*See* Weise Dep. at 149.)  In

addition, both Officer Kollman and Officer Weise have testified that they observed no

evidence of domestic violence, abuse, or neglect in the Wrights' apartment, and that, after

speaking to Mrs. Wright, they concluded that "it was just an argument" with no use of

---

[7]According to Mr. Wright, his wife and children were in the living room witnessing the
entire incident, from the time the officers entered the apartment until they handcuffed him.  (*See
id.* at 90-91.)  While Mrs. Wright instructed the children at one point to go to their bedroom, Mr.
Wright told them, "No, no, don't go nowhere, stay right there."  (*Id.* at 91.)  He explained that he
did not "trust [the officers], because they burst in my house," so "if anything was going to
happen, my wife and kids w[ere] going to be right there" as witnesses to the officers' conduct.
(*Id.* at 91-92.)

[8]As noted earlier, Plaintiffs have acknowledged that the record is insufficient to charge
these five officers with liability for any purported failure to intervene in the alleged use of
excessive force by Officers Kollman and Weise.

physical force. (Kollman Dep. at 91; *see also* Weise Dep. at 152-53.)[9]  Similarly, the officers acknowledged that they saw no evidence of weapons, drug or alcohol use, or criminal activity in the apartment. (*See* Kollman Dep. at 90-91; Weise Dep. at 153.)

At the conclusion of this incident, Mr. Wright was arrested for resisting and obstructing a police officer. Mrs. Wright was advised by Officer Kollman that her husband was being taken to the Bloomfield Township Police Department, and that he would be released in about an hour after he was booked and a $100 bond was paid. (*See* M. Wright Dep. at 34; Kollman Dep. at 94-95.) When Mrs. Wright went to the police station to pick up her husband, however, she was told that Mr. Wright was "not saying a word to us at this point," and that she should return in about 45 minutes. (M. Wright Dep. at 35.) Mrs. Wright returned to the police station as instructed, but she was again told that she would have to come back later "because we're waiting for a detective to come in to do an investigation." (*Id.*) Mrs. Wright then returned to the police station for a third

---

[9]Despite this testimony, Officer Kollman placed a call to Children Protective Services ("CPS") following the incident at Plaintiffs' apartment, and he provided this agency with a copy of the police report from the incident. (*See* Kollman Dep. at 109-10.) Officer Kollman initially explained that he did so out of concern that Mr. Wright had insisted that his children stay in the room to watch his interactions with the police and "see how everything was trans-folding [sic]." (*Id.* at 109-110.) Later in his deposition, however, Officer Kollman testified that his call to CPS was motivated by "information" purportedly received by the Bloomfield Township Police Department that Mr. Wright had exhibited an "ongoing problem" with "his demeanor and behavior" in front of his children, although Officer Kollman conceded that he had never spoken to the person who provided this information. (*Id.* at 113.) For his part, Officer Weise testified that from what he observed during the incident at Plaintiffs' apartment, he did not see any reason for contacting CPS. (*See* Weise Dep. at 183.) CPS determined that no action should be taken on Officer Kollman's report, concluding that "[t]his referral does not meet the standards for abuse or neglect." (Plaintiffs' Response, Ex. M, Children Protective Services Complaint at 3.)

time, and was told that "you're not going to get him tonight" because Mr. Wright was being transferred to the Oakland County Jail. (*Id.*)

Following his arrest, Mr. Wright initially was taken to the Bloomfield Township Police Department, where he was booked and fingerprinted. When an officer asked him to explain what had happened at the apartment, Mr. Wright responded that he "didn't want to speak about anything" and "wasn't going to talk about it." (A. Wright Dep. at 104.) Upon arriving at the police station, Officer Kollman discussed the incident with another Defendant officer, Sergeant Harshberger, and it was determined that Mr. Wright should be charged with the felony offense of resisting and obstructing, rather than a misdemeanor offense or local ordinance violation as Officer Kollman had contemplated when he spoke to Mrs. Wright at her apartment. (*See* Kollman Dep. at 96-99.) As a result, Officer Kollman acknowledged that the amount of Mr. Wright's bond was "up to a judge," rather than the $100 amount that he had anticipated and indicated to Mrs. Wright back at Plaintiffs' apartment. (*See id.* at 94-95, 99-100.) In addition, Officers Kollman and Weise transported Mr. Wright to the Oakland County Jail, where he was kept in custody until he could be brought before a judge on the felony offense with which he was charged.

Mr. Wright spent eight days in the Oakland County Jail before he was released. He was arraigned on the afternoon of December 5, 2011, the day after his arrest, and bond was set at $25,000. Mrs. Wright testified that she did not have the $2,500 necessary to post her husband's bond, and instead had to seek out a bail bondsman and obtain money

10

from her mother-in-law in order to secure her husband's release. (*See* M. Wright Dep. at 40-43.) Mrs. Wright also reported having trouble getting her name placed on a visitor's list so that she could visit Mr. Wright at the Oakland County Jail. (*See id.* at 36-38.)

The prosecutor ultimately elected to charge Mr. Wright with the misdemeanor offense of resisting and obstructing a police officer, and he was acquitted following a jury trial. This suit followed, with Plaintiffs alleging that Defendants unlawfully entered their home without a warrant, used excessive force, conspired among themselves to violate their federally protected civil rights, and committed a number of violations of Michigan law.

## III. <u>ANALYSIS</u>

### A.    The Standards Governing Defendants' Motion

Through the present motion, Defendant Bloomfield Township and the nine individual Defendant law enforcement officers named in Plaintiffs' complaint seek an award of summary judgment in their favor on Plaintiffs' federal claims under 42 U.S.C. § 1983 of unlawful entry, excessive force, civil conspiracy, and municipal liability, as well as Plaintiffs' state-law claims of assault and battery, false arrest and imprisonment, malicious prosecution, gross negligence, intentional infliction of emotional distress, and loss of consortium. Under the Federal Rule governing Defendants' motion, summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of

11

summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007). Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party." *Smith Wholesale,* 477 F.3d at 861 (internal quotation marks and citation omitted).

**B.    Issues of Fact Remain as to Whether Officers Kollman and Weise Unlawfully Entered Plaintiffs' Residence.**

In Count I of their complaint, Plaintiffs allege that several of the individual

12

Defendant police officers violated their Fourth Amendment rights by unlawfully entering their home without a warrant and without any exigent circumstances that would justify a warrantless entry.  Through the present motion, the Defendant officers seek a determination as a matter of law that their warrantless entry into Plaintiffs' apartment was lawful under the circumstances, and they contend, in the alternative, that the doctrine of qualified immunity shields them from liability for any such Fourth Amendment violation. As discussed below, the Court finds that issues of fact preclude a determination as a matter of law as to either of these two arguments advanced in Defendants' motion.

As this Court stated in an earlier case involving allegations of an unlawful warrantless entry into a private residence:

> It is a fundamental tenet of Fourth Amendment jurisprudence that "searches and seizures inside a home without a warrant are presumptively unreasonable."  *United States v. Rohrig,* 98 F.3d 1506, 1513 (6th Cir. 1996) (quoting *Payton v. New York,* 445 U.S. 573, 586, 100 S. Ct. 1371, 1380 (1980)).  "The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," and "the warrant procedure minimizes the danger of needless intrusions of that sort."  *Payton,* 445 U.S. at 585-86, 100 S. Ct. at 1379-80 (internal quotations, citation, and footnote omitted).  Absent a warrant, only "exigent circumstances" may justify governmental entry into a private home.  *See Payton,* 445 U.S. at 590, 100 S. Ct. at 1382; *Rohrig,* 98 F.3d at 1515.

*Strutz v. Hall,* 308 F. Supp.2d 767, 776 (E.D. Mich. 2004), *appeal dismissed,* 124 F. App'x 939 (6th Cir. Feb. 25, 2005).  Here, as in *Strutz,* the Defendant police officers did not secure a warrant before entering Plaintiffs' home.  Consequently, this entry may be justified, if at all, only by an appeal to exigent circumstances.

The Sixth Circuit has explained that "[e]xigent circumstances are situations where

13

real[,] immediate and serious consequences will certainly occur if the police officer postpones action to obtain a warrant." *Thacker v. City of Columbus,* 328 F.3d 244, 253 (6th Cir. 2003) (internal quotation marks and citations omitted). In determining whether a warrantless entry is justified by exigent circumstances, the subjective motivation or state of mind of the entering officer is immaterial, "as long as the circumstances, viewed *objectively,* justify [the] action." *Brigham City v. Stuart,* 547 U.S. 398, 404, 126 S. Ct. 1943, 1948 (2006) (internal quotation marks and citation omitted) (emphasis and alteration in original). Moreover, in making this determination, this Court must "consider the totality of the circumstances and the inherent necessities of the situation at the time." *Rohrig*, 98 F.3d at 1511 (internal quotation marks and citations omitted).

In this case, Defendants contend that their entry into Plaintiffs' apartment was consistent with the recognized authority of law enforcement officers to "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Stuart,* 547 U.S. at 403, 126 S. Ct. at 1947. More specifically, Defendants point first to the decision in *Thacker, supra,* 328 F.3d at 248-49, 253-55, in which the Sixth Circuit held that exigent circumstances justified a warrantless entry into a home following a 911 call placed by plaintiff Jessica Gallagher, a resident of the home, who reported that her live-in fiancé, plaintiff Jeffrey Thacker, was cut and bleeding. The court observed that upon the defendant police officers' arrival at the plaintiffs' apartment, "the following information was available" to them:

Someone had placed a 911 call reporting an emergency — a cutting or

14

stabbing — at the residence.  Thacker answered the door shirtless, with blood on his legs and boxer shorts.  It was apparent that Thacker himself was injured, as the officers could see that he was bleeding from a cut on his hand.  The cut was deep enough to require stitches, but Thacker had wrapped his shirt around his hand to slow the profuse bleeding.  Immediately, Thacker acted belligerently and used profanity.  He appeared intoxicated.  Thacker failed to provide any explanation for the injury.  Instead, he demanded assistance from the paramedics, who were waiting outside for the officers to tell them that it was safe to enter.  When the door was opened, [one of the defendant officers] could see the kitchen area, including the kitchen table, to the right and the main living room area to the left.  In the kitchen, he could see a broken beer bottle on the floor, a whole in the kitchen wall a couple feet off the floor, and liquid splashed on the wall and spilled on the floor.  The officers did not see Gallagher until they were already crossing the threshold to enter the apartment, at which point Thacker left the doorway to sit at the kitchen table.

*Thacker,* 328 F.3d at 254 (quotation marks omitted).

Against this backdrop, the court found that the defendant officers' warrantless entry into the plaintiffs' apartment was justified by exigent circumstances:

Although it presents a close question, the uncertainty of the situation, in particular, of the nature of the emergency, and the dual needs of safeguarding the paramedics while tending to Thacker's injury, created exigent circumstances here.  The 911 call in this case reported a cutting or stabbing.  Such an emergency call requires a police and paramedic response and potentially involves serious peril to the officers, paramedics, or others.  The call solicited a response from an emergency team.  Although this does not amount to consent justifying the search, it clearly weighs in favor of finding that plaintiffs' expectation of privacy in their home was diminished.  The officers were placed in a difficult position in that they were duty-bound to respond to Thacker's request for assistance, but also rebuffed when they attempted to do so.

The safety of the paramedics and others in this case also must be considered.  The officers had to secure the safety of the paramedics before the paramedics could attend to Thacker.  Thacker did not explain his injury or anything else to the police while they were on the porch.  His demeanor and attitude indicated that Thacker could have posed a threat to the safety of

15

the officers or paramedics.  Moreover, it was not clear who else was in the apartment and, therefore, whether any others might either pose a threat or be in danger.  The officers could see broken glass and a hole in the kitchen wall.  This observation made it unclear whether an altercation or an accident had occurred.  These facts created uncertainty that, given Thacker's lack of cooperation, could only be dispelled by entering the home and investigating further.  Finally, there was no opportunity to obtain a warrant before administering medical aid to Thacker, who was obviously seriously injured.

*Thacker,* 328 F.3d at 254-55.  Thus, under "the totality of the circumstances, including the 911 emergency call, Thacker's conduct, and the uncertainty of the situation," the court found that the defendant officers' warrantless entry was "justified . . . to secure the safety of the police, paramedics, and other people possibly inside the home."  328 F.3d at 254.

Defendants further contend that the facts here are akin to those presented in *Lawrence v. Bloomfield Township,* No. 05-2511, 313 F. App'x 743 (6th Cir. Mar. 7, 2008).  In that case, the defendant police officers responded to a 911 call of domestic violence, and upon arriving at the plaintiff's house, they saw a "young child . . . through a screen door and beckoned him outside."  *Lawrence,* 313 F. App'x at 745.  When the child exited the house, "the officers observed that his eye was swollen and bleeding from a sizable cut," and he "told the officers that his father, Frank Lawrence, Sr., had hit him."  313 F. App'x at 745.  The father then appeared at the door, and "an officer asked him to come out of the house and arrested him."  313 F. App'x at 745.[10]

---

[10]Although the Sixth Circuit's opinion does not disclose the source of the 911 call through which the defendant officers were summoned to the home, the district court opinion states that the 911 call was placed by the injured child, who reported that his father had hit him in the face with a board.  *See Lawrence v. Bloomfield Township,* No. 00-74302, 2005 WL 2649173, at *1 (E.D. Mich. Oct. 17, 2005).  Upon their arrival at the home, the officers were

16

In an effort to further investigate and determine whether there were additional suspects or victims inside the house, the defendant officers approached the front door and observed plaintiff Frank Lawrence, Jr. in the kitchen.  When the officers asked Lawrence to step outside and speak to them as part of their investigation of an apparent criminal act on the premises, he responded with repeated profanity and "yelled several times, 'You're not coming in my house.  You need a search warrant.'" *Lawrence,* 313 F. App'x at 745. The officers then advised Lawrence that they could enter the house without a warrant and began to do so, but he responded by standing with his legs spread in the doorway and using his body to block the entrance.  "After it became clear that Lawrence would not cooperate, the officers reached into the house, pulled Lawrence out, took him to the ground and told him to sit down on a bench."  313 F. App'x at 745.  One officer then "conducted a protective sweep of the house to look for additional suspects or potential victims," while another officer entered the house with the child who had been struck by his father "to find the board with which his father hit him."  313 F. App'x at 745.

Under these facts, the Sixth Circuit affirmed the district court's award of summary judgment in the defendant officers' favor on Lawrence's claim of an illegal warrantless entry into his home.  The court explained:

> Even when we read all of the inferences Lawrence's way, the officers still
> faced the following undisputed risks:  (1) they were responding to a 911

---

advised by the injured victim that his father was subject to a personal protection order that prohibited him from being on the property. *See Lawrence,* 2005 WL 2649173, at *1.  Thus, the father was arrested both for domestic violence and for violating a personal protection order.

call; (2) the call concerned a complaint about domestic violence; (3) the officers encountered a bloody victim when they arrived on the scene; and (4) they encountered a third individual (apparently neither the assailant nor a victim) who, far from cooperating with the officers' reasonable inquiries, belligerently and defensively greeted their every entreaty. Hindsight, it is true, shows that no other victim or assailant remained in the house, but a reasonable officer could fairly determine that he needed to conduct a brief search to ensure that was so.

While the dispatcher told officers that there were three people in the house, the officers had reasonable bases for ensuring that they had accounted for all potential victims and assailants. That is not just because officers may (and should) take domestic-violence 911 calls seriously, but also because these officers were entitled to make sure that information from the dispatcher was true so that they would not find out later that there was another victim inside the house who was severely injured.

Lawrence of course did not help matters. The complete picture after all includes more than just the plaintiff's refusal to provide information; it also includes profanity-laced yelling at the officers, as well as the disruptive character of his speech. That he was yelling at them, repeatedly saying "F[] you" and using his body to block the doorway, could fairly give the officers pause that they had identified the only victim in the case and taken control of the only assailant. Lawrence's aggressive, aberrant behavior could reasonably lead the officers to believe that someone else was in the house. The district court correctly rejected this claim [of unlawful entry] as a matter of law.

313 F. App'x at 747-48 (internal quotation marks, alterations, and citations omitted).

Returning to the present case, Defendants argue that the facts here, like those presented in *Thacker* and *Lawrence,* establish as a matter of law that the warrantless entry into Plaintiffs' apartment was justified by exigent circumstances. Yet, to support this contention, Defendants rely on a version of the facts that is disputed on several key points, as opposed to a record viewed in a light most favorable to Plaintiffs as the non-moving parties. Defendants assert, for example, that Officers Kollman and Weise "heard

18

a loud verbal argument" upon arriving at Plaintiffs' apartment, (Defendants' Motion, Br. in Support at 16), but Plaintiffs have testified that their argument had concluded before the officers knocked on their door, (*see* A. Wright Dep. at 45; M. Wright Dep. at 12). Defendants further claim that when Mr. Wright answered the door, "he opened it only a crack," (Defendants' Motion, Br. in Support at 16), but Plaintiffs have pointed to evidence that Mr. Wright opened the door a foot and a half or more, (*see* A. Wright Dep. at 49; *see also* Plaintiffs' Response, Ex. H, 1/17/2012 Trial Tr. at 75).  In addition, while Defendants maintain that Mr. Wright was "highly agitated, belligerent, and confrontational" when he answered the door, and that he refused the officers' offer to speak with them outside the apartment, (Defendants' Motion, Br. in Support at 16), Mr. Wright has denied that the officers gave him the option to speak with them in the hallway, and he has testified that he and the officers were merely "having a conversation" when he refused the officers' request to enter his home, (A. Wright Dep. at 52, 54).

In light of these disputes as to material facts, the Court finds that the question of exigent circumstances cannot be resolved as a matter of law at the present juncture.  In both *Thacker* and *Lawrence,* the defendant police officers responded to a 911 call made by someone inside the home, and arrived to discover an ongoing situation in which someone was injured and in need of immediate medical attention.  *See Thacker,* 328 F.3d at 254; *Lawrence,* 313 F. App'x at 747.  When the officers in these two cases sought to investigate the cause of these injuries and determine whether others on the premises were also at risk of injury or in need of assistance, they were confronted by individuals who

19

impeded these efforts by acting belligerently and using profanity in response to the
officers' inquiries and requests to enter the premises.  *See Thacker,* 328 F.3d at 254;
*Lawrence,* 313 F. App'x at 747.  Here, in contrast, if the record is viewed in a light most
favorable to Plaintiffs, it discloses (i) that the 911 call to which the Defendant officers
responded was placed by a neighbor, and not anyone within Plaintiffs' home; (ii) that the
argument that precipitated this 911 call was over before the Defendant officers arrived at
Plaintiffs' apartment; (iii) that Mr. Wright did not act belligerently when he answered the
door, but instead merely had a "conversation" with the officers in which he stated that
there was no disturbance and thus no need for the officers to enter his home; (iv) that the
officers did not attempt to investigate the neighbor's complaint of a domestic disturbance
by speaking to Mr. and Mrs. Wright outside their apartment, but instead insisted that they
be allowed inside to investigate; and (v) that both Officer Kollman and Officer Weise
were able to observe Mrs. Wright through the open doorway, with Officer Weise
testifying that Mrs. Wright did not appear to be injured.

This record falls short of establishing as a matter of law that it was necessary to
enter Plaintiffs' home without a warrant in order to "render emergency assistance to an
injured occupant or to protect an occupant from imminent injury."  *Stuart,* 547 U.S. at
403, 126 S. Ct. at 1947.  The 911 call that brought Officers Kollman and Weise to
Plaintiffs' apartment primarily reported a loud argument and profanity; while the caller
heard what she believed was a slap, she advised the 911 dispatcher that she heard "no
beating."  (Defendants' Motion, Ex. 1, 911 Call Recordings.)  In addition, Plaintiffs have

20

testified that by the time the officers arrived at their residence, their argument had concluded and they had moved on to other activities, and this testimony must be credited for purposes of deciding Defendants' summary judgment motion.  In contrast to the facts in *Thacker,* then, where a 911 call from inside the residence reported that an occupant was cut and bleeding, the 911 call in this case did not indicate that anyone inside Plaintiffs' home was in need of emergency aid or medical assistance.  Moreover, while the defendant officers in *Thacker* observed upon their arrival at the plaintiffs' residence that an individual at the residence was injured and bleeding, and also saw signs of a struggle on the premises, the record here lacks any sort of comparable evidence of facts observed at the scene that would suggest that someone within Plaintiffs' home was in need of emergency assistance.  *Compare Thacker,* 328 F.3d at 254 n.2 (observing that the 911 call in that case "reporting an emergency[] justified a police response to investigate the situation further, but did not necessarily justify entry into a private home," and reasoning that "[o]nly when the police arrived at the home and observed facts indicative of exigent circumstances[] were they justified in entering the home"), *with Nelms v. Wellington Way Apartments, LLC,* No. 11-3404, 513 F. App'x 541, 546-47 (6th Cir. Feb. 4, 2013) (finding that a call to the police of "property destruction in progress," combined with an investigation on the scene that failed to uncover a "reasonable basis to believe that an occupant of the [plaintiff's] apartment was in need of immediate aid," did not provide a justification for a warrantless entry into the apartment).

Neither can it be said that Mr. Wright's interaction with Officers Kollman and

21

Weise at the door to his apartment provided a basis for the Defendant officers to enter the home without a warrant in order to render emergency aid or protect an occupant against imminent injury.  Contrary to Defendants' suggestion that Mr. Wright acted in an "agitated, belligerent, and confrontational" manner when Officers Kollman and Weise asked to enter his home, (Defendants' Motion, Br. in Support at 16), Mr. Wright has testified that he declined the officers' request because "there was nothing going on" in his home and "no disturbance" for the officers to investigate, and that he was merely "having a conversation" with the officers when they announced that they were "going to knock the door down" if he did not allow them to enter, (A. Wright Dep. at 51-52).  Thus, the record here, viewed in a light most favorable to Plaintiffs, lacks the evidence of tumultuous activity, combative conduct, or profanity-laced speech that the courts have cited as factors supporting the need for a warrantless entry to render emergency aid.  *See, e.g., Michigan v. Fisher,* 558 U.S. 45, 130 S. Ct. 546, 547-49 (2009) (finding that a warrantless entry was justified by exigent circumstances where officers responding to a complaint of a disturbance "found a household in considerable chaos," including (i) a pickup truck in the driveway "with its front smashed" and with blood on its hood, (ii) blood on one of the doors to the house, and (iii) an individual inside the house who was "screaming and throwing things" and who, when asked if he needed medical attention, "demanded, with accompanying profanity, that the officers go to get a search warrant"); *Stuart,* 547 U.S. at 400-01, 406, 126 S. Ct. at 1946, 1949 (finding that a warrantless entry was lawful where officers responded to a "melee" that featured loud noise and "shouting from inside" the

22

home, as well as an altercation visible from outside the home in which one individual struck another in the face with a fist and the victim was seen "spitting blood into a nearby sink"); *Schreiber v. Moe,* 596 F.3d 323, 330-31 (6th Cir. 2010) (holding that the defendant officer did not violate the plaintiff's Fourth Amendment rights by entering his house without a warrant, where the officer responded to a 911 call reporting that a teenage girl at the home was being beaten by her parents, the officer "heard a male voice shouting from within the home" upon his arrival, and the plaintiff responded to the officer's knock on the door and expression of concern for the teenage girl's welfare by "abruptly t[elling] [the officer] to leave and bombard[ing] him with a slew of profanities"); *Thacker,* 328 F.3d at 254 (observing that plaintiff Thacker was visibly injured when he answered the door to his residence, and that he "acted belligerently and used profanity" in his initial interactions with the defendant officers); *cf. Modrell v. Hayden,* No. 09-5419, 436 F. App'x 568, 574 (6th Cir. Aug. 30, 2011) (holding that the defendant police officer failed to establish that his warrantless entry into the upstairs portion of a duplex was justified, where the plaintiff homeowner "repeatedly denied [the officer] permission to enter [and] questioned the legality of [the officer's] actions" but "made no threats, direct or indirect, against [the defendant officer] or his fellow officers").

In light of the Court's conclusion that issues of fact remain as to whether the warrantless entry into Plaintiffs' home was justified by exigent circumstances, it remains only to consider whether Defendants' appeal to qualified immunity overcomes these

23

issues of fact and mandates an award of summary judgment in Defendants' favor.  Under

the doctrine of qualified immunity, "government officials performing discretionary

functions generally are shielded from liability for civil damages insofar as their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727,

2738 (1982).  Application of the doctrine entails two inquiries.  "First, the court must

determine whether, based upon the applicable law, the facts viewed in the light most

favorable to the plaintiff[] show that a constitutional violation has occurred." *Burchett v.*

*Kiefer,* 310 F.3d 937, 942 (6th Cir. 2002).  "If the court finds a constitutional violation, it

must then consider whether the violation involves clearly established constitutional rights

of which a reasonable person would have known." *Burchett,* 310 F.3d at 942.[11]

The Court has already conducted the first of these inquiries, determining that the

record viewed in a light most favorable to Plaintiffs establishes that Officers Kollman and

Weise made an unlawful warrantless entry into Plaintiffs' apartment.  As to the question

whether this warrantless entry violated Plaintiffs' clearly established Fourth Amendment

protection against unreasonable searches, Defendants offer only a boilerplate statement of

the law of qualified immunity, followed by a terse one-sentence argument that "decisions

within [this circuit] . . . made it reasonable for the officers to believe that their actions in

---

[11]The Supreme Court recently explained that the two steps of this qualified immunity
inquiry need not be rigidly performed in the same sequence in every case, and that courts may
"exercise their sound discretion in deciding which of the two prongs of the qualified immunity
analysis should be addressed first in light of the circumstances of the particular case at hand."
*Pearson v. Callahan,* 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009).

going into the residence were lawful." (Defendants' Motion, Br. in Support at 26 (citing *Thacker* and *Rohrig*).) As the Sixth Circuit has explained, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argument, are deemed waived." *Dillery v. City of Sandusky,* 398 F.3d 562, 569 (6th Cir. 2005) (internal quotation marks and citations omitted).

In any event, the Court finds that the pertinent Supreme Court and Sixth Circuit case law describes with sufficient clarity what is required to demonstrate exigent circumstances. More specifically, the Supreme Court rulings in *Fisher* and *Stuart* and the Sixth Circuit's decision in *Thacker* all emphasized the observations of police officers on the scene that led to a justified, objectively reasonable belief that someone in the home was in need of immediate medical assistance or faced an imminent threat of serious injury. Indeed, even Defendants recognize that the relevant case law points to evidence of "irrational, agitated, and/or bizarre behavior" as an indicator of exigent circumstances. (Defendants' Motion, Br. in Support at 14.) The record here, in contrast — at least when viewed in a light most favorable to Plaintiffs — lacks any such evidence that would give rise to an objectively reasonable belief that someone in Plaintiffs' apartment needed emergency medical aid or was in immediate and serious peril. Accordingly, even though Plaintiffs may not have identified "a case directly on point" holding under similar facts that a warrantless entry was unlawful, the Court finds that the case law addressing the emergency aid exception to the warrant requirement is sufficiently well-developed and uniform to provide "fair warning" to Officers Kollman and Weise that their entry into

25

Plaintiffs' apartment without a warrant violated the Fourth Amendment.  *Nelms,* 513 F.

App'x at 547 (internal quotation marks and citations omitted); *see also Keeton v.*

*Metropolitan Government of Nashville & Davidson County,* No. 06-5865, 228 F. App'x

522, 524 (6th Cir. Mar. 29, 2007) (explaining that where a "violation [i]s sufficiently

obvious under the general standards of constitutional care," a "plaintiff need not show a

body of materially similar case law" (internal quotation marks and citations omitted)).  It

follows that the doctrine of qualified immunity does not shield these two Defendant

officers from liability for their allegedly unlawful entry into Plaintiffs' home.

## C.  Issues of Fact Remain as to Whether Officers Kollman and Weise Unlawfully Used Excessive Force Against Mr. Wright Following Their Entry into Plaintiffs' Apartment.

In Count II of their complaint, Plaintiffs assert a § 1983 claim of excessive force

against the individual Defendant police officers who entered their apartment, alleging that

these officers either employed unnecessary and unreasonable force against Mr. Wright

despite his lack of resistance, or stood by and failed to intervene when fellow officers

employed this excessive force.[12]  Through their present motion, Defendants seek an award

of summary judgment in their favor on this claim of excessive force, arguing that Officers

Kollman and Weise used an appropriate degree of force to subdue Mr. Wright as he

---

[12]As noted earlier, Plaintiffs have conceded in their response to Defendants' motion that the evidence does not support their "failure to intervene" theory of recovery against the five Defendant officers who entered their home following the initial warrantless entry by Officers Kollman and Weise.  Accordingly, Plaintiffs' § 1983 claim of excessive force, like their § 1983 claim of unlawful entry, may go forward only against Defendants Kollman and Weise, and will be dismissed as to the remaining officers named as Defendants.

purportedly resisted their lawful commands.  Defendants further contend that even if

these two officers might have used excessive force during their struggle with Mr. Wright,

they are nonetheless shielded from liability under the doctrine of qualified immunity.  As

discussed below, the Court concludes that issues of fact once again preclude an award of

summary judgment in Defendants' favor as to either of these two challenges to Plaintiffs'

claim of excessive force.

Plaintiffs' federal § 1983 claim of excessive force rests upon the Fourth

Amendment protection against unreasonable seizures.  *See Graham v. Connor,* 490 U.S.

386, 394-95, 109 S. Ct. 1865, 1871 (1989).  As the Sixth Circuit has explained:

> The Fourth Amendment requires that an officer's use of force be
> objectively reasonable, and courts must balance the consequences to the
> individual against the government's interest in effecting the seizure.  This
> standard contains a built-in measure of deference to the officer's on-the-
> spot judgment about the level of force necessary in light of the
> circumstances of the particular case.  Courts evaluating the reasonableness
> of force used should pay particular attention to the severity of the crime at
> issue, whether the suspect poses an immediate threat to the safety of the
> officers or others, and whether he is actively resisting arrest or attempting to
> evade arrest by flight.

*Burchett,* 310 F.3d at 944 (internal quotation marks and citations omitted).

Defendants' challenge to Plaintiffs' claim of excessive force rests on the premise

that Mr. Wright was "physically resisting the officers' legitimate restraint efforts"

following the officers' entry into Plaintiffs' apartment.  (Defendants' Motion, Br. in

Support at 22.)  As Defendants point out, the case law indicates that some degree of force,

including the use of a taser, is appropriate when a suspect is actively resisting an officer's

lawful efforts to handcuff or otherwise restrain him.  *See, e.g., Eldridge v. City of Warren,* No. 12-1500, 533 F. App'x 529, 533-35 (6th Cir. Aug. 5, 2013); *Hagans v. Franklin County Sheriff's Office,* 695 F.3d 505, 509 (6th Cir. 2012); *Caie v. West Bloomfield Township,* No. 11-1378, 485 F. App'x 92, 96-97 (6th Cir. June 18, 2012); *Brady v. City of Westland,* 1 F. Supp.2d 729 (E.D. Mich. 2014).  In this case, Defendants view the record as establishing that Mr. Wright resisted the efforts of Officers Kollman and Weise to arrest him "by tensing his arms when the officers asked him to place them behind his back," and that Mr. Wright continued this active resistance by "refus[ing] to go to the ground" and "prevent[ing] [the] officers from getting his hands behind his back, even once he was placed on the ground."  (Defendants' Motion, Br. in Support at 22.)

Once again, however, Defendants have failed to acknowledge the well-established principle that in resolving a summary judgment motion, the Court must view the record in a light most favorable to Plaintiffs as the non-moving parties.  In particular, Mr. Wright has expressly denied that Officers Kollman and Weise requested or directed him to put his arms behind his back.  Rather, he testified that when the two officers forcibly entered his apartment, he stood back from the doorway and put his hands in the air.  (*See* A. Wright Dep. at 55, 197, 200.)  At this point, the officers did not ask him to put his hands behind his back, but instead ordered him to get down on the ground.  (*See id.* at 56, 197-98.)  When Mr. Wright balked at this command, each of the officers grabbed one of his arms by the wrist and attempted to pull his arms down while repeating their instruction that he get down on the ground.  (*See id.* at 56-60.)  Nowhere in this process, according to

Mr. Wright, did the officers attempt to get him to put his hands behind his back, nor did he testify — despite Defendants' assertions to the contrary, (*see* Defendants' Motion, Br. in Support at 4, 22) — that he resisted any such efforts by tensing his arms. (*See* A. Wright Dep. at 58-59, 197-98.)[13]

Under this record, viewed in a light most favorable to Plaintiffs, it cannot be said as a matter of law that Mr. Wright was actively resisting the efforts of Officers Kollman and Weise to get his hands behind his back and handcuff him, such that the officers would have been permitted to employ a reasonable degree of force, including knee strikes and a taser, in order to secure Mr. Wright's compliance with these efforts to restrain him. At most, the evidence indicates that Mr. Wright was non-compliant with the officers' commands that he get down on the ground, and that he and the officers were "[s]truggling around" as the officers held onto his wrists and attempted to get him down to the floor. (A. Wright Dep. at 57, 59, 64.) Yet, as the Sixth Circuit has explained, "noncompliance alone does not indicate active resistance; there must be something more," such as a "verbal showing of hostility" or "a deliberate act of defiance using one's own body." *Eldridge,* 533 F. App'x at 535. Where, as here and in *Eldridge,* "the only individuals conveying any sense of aggression were the two officers," and Mr. Wright "played no role in escalating the aggression," beyond his refusal to obey the officers' command to get down on the floor of his home, the Sixth Circuit has held that its precedent "does not

---

[13]Plaintiffs further observe that Mr. Wright was acquitted of the state-law charge of resisting and obstructing a police officer.

29

justify the use of a Taser" as a means of restraining a suspect.  *Eldridge,* 533 F. App'x at 535.

Just as importantly, Defendants' challenge to Plaintiffs' claim of excessive force fails to account for the legal significance of the antecedent question addressed above — namely, whether Officers Kollman and Weise were lawfully on the premises when they grabbed Mr. Wright's arms and attempted to restrain him.  This Court addressed this matter in *Elliot v. Lator,* No. 04-74817, 2006 WL 1806475 (E.D. Mich. June 28, 2006), *appeal dismissed,* 497 F.3d 644 (6th Cir. 2007), a case in which the defendant police officers entered the plaintiffs' home pursuant to a warrant that was determined not to be supported by probable cause.  Having found that the defendant officers' entry into the plaintiffs' home was unlawful, the Court explained that "[i]t is only a short step from this ruling to the further conclusion that Plaintiffs were unlawfully 'seized' in the immediate aftermath of Defendants' unlawful entry into their home."  *Elliot,* 2006 WL 1806475, at *9.  In particular, while this Court acknowledged the Supreme Court's ruling in *Michigan v. Summers,* 452 U.S. 692, 705, 101 S. Ct. 2587, 2595 (1981), that a lawfully issued search warrant "carries with it the limited authority to detain the occupants of the premises while a proper search is conducted," it noted that the decision in *Summers* rested principally upon the fact that the police had obtained a warrant, such that the detention of the occupants during the execution of the warrant reflected "only a modest and necessary *additional* invasion of [the occupants'] right to be left alone."  *Elliot,* 2006 WL 1806475, at *9-*10.  Where, in contrast, an officer's entry into a home is not based on a warrant or

some other lawful ground, such as exigent circumstances, this Court found that the mere presence of an individual in the home did not confer the authority to detain this individual, nor to employ "anything beyond the most modest degree of force" to effect this detention. *Elliot,* 2006 WL 1806475, at *10-*12; *see also Smith v. Stone,* No. 99-3208, 2000 WL 687672, at *7 n.4 (6th Cir. May 19, 2000) (noting that the defendant police officers in that case could not appeal to *Summers* to justify their detention of the plaintiffs during a search of their residence because "the police did not have a valid warrant"); *Jacobs v. City of Chicago,* 215 F.3d 758, 772 (7th Cir. 2000) (explaining that "[w]hen there is no longer probable cause to believe criminal activity is taking place at the location where an individual is found, the mere presence of the individual in that place is no justification for seizing that individual").

These cases provide an additional basis for determining that Plaintiffs' claim of excessive force should be permitted to go forward.  As discussed earlier, issues of fact remain as to whether the warrantless entry into Plaintiffs' apartment was justified by exigent circumstances.  If the trier of fact concludes that it was not, then Officers Kollman and Weise lacked the authority to detain any individual they came upon as a result of their unlawful entry into Plaintiffs' residence, or to employ anything beyond the most modest force — as opposed to the knee strikes and taser stuns used here — in aid of their effort to detain any such individual found in the residence.  To be sure, the Sixth Circuit has recognized that "certain temporary seizures are justified if the officers have a reasonable articulable suspicion that the detainee is or has engaged in criminal activity,"

31

or if an officer conducting an investigation "act[s] out of a justifiable fear of personal safety." *Ingram v. City of Columbus,* 185 F.3d 579, 591-92 (6th Cir. 1999). Here, however, the officers were responding to a report of a loud argument and profanity, which would not necessarily rise to the level of criminal activity — and, indeed, Officers Kollman and Weise have testified that they observed no evidence of domestic violence, abuse, or neglect upon their entry into Plaintiffs' apartment, and that, after speaking to Mrs. Wright, they concluded that "it was just an argument" with no use of physical force. (Kollman Dep. at 91; *see also* Weise Dep. at 152-53.)[14] Neither have the officers claimed that Mr. Wright's conduct triggered concerns for their personal safety; to the contrary, Officer Kollman testified that he was not afraid of Mr. Wright. (*See* Kollman Dep. at 100.) Accordingly, a number of factual questions remain for the trier of fact to decide in order to resolve Plaintiffs' claim of excessive force.

Finally, Defendants seek to shore up their challenge to Plaintiffs' claim of excessive force through an appeal to qualified immunity. Again, however, Defendants'

---

[14]Notably, while Defendants have appealed to this authority of the police to "physically detain an individual while they investigate, if they have 'reasonable suspicion' that an individual has committed a crime," (Defendants' Motion, Br. in Support at 17), they do not contend that Officers Kollman and Weise had any such reasonable suspicion of criminal activity when they arrived at Plaintiffs' apartment. Rather, they argue that once the officers "entered the home and Mr. Wright physically resisted their investigative efforts (if not before), they had probable cause to arrest Mr. Wright for resisting and obstructing." (*Id.* at 18.) Yet, the record indicates that the officers did not engage in any such "investigative efforts" upon their initial entry into Plaintiffs' apartment, but instead acted immediately to restrain Mr. Wright by ordering him to the ground and grabbing his wrists when he refused to do so. Plainly, the authority to temporarily detain an individual must rest upon events that occurred ***prior*** to the detention, and not upon the individual's resistance to the very act of detention at issue.

argument in support of qualified immunity, which spans only three brief sentences and rests solely on the Sixth Circuit's ruling in *Hagans,* 695 F.3d at 508-11, is not sufficiently developed to merit the Court's consideration. *See Dillery,* 398 F.3d at 569.   In any event, *Hagans* surveys a number of prior Sixth Circuit decisions recognizing that a police officer uses excessive force by employing a taser on a suspect who is not actively resisting the officer's efforts to arrest or subdue him. *See Hagans,* 695 F.3d at 509 (collecting cases); *see also Eldridge,* 533 F. App'x at 533 (citing *Hagans* for the proposition that "it is unreasonable to tase a nonresisting suspect"). As explained, issues of fact remain as to whether Mr. Wright actively resisted the attempts of Officers Kollman and Weise to arrest or restrain him, and these fact questions preclude a determination as a matter of law that these officers are protected by qualified immunity.

**D.    Plaintiffs' § 1983 Claim of Conspiracy Is Defeated by the Intra-Corporate Conspiracy Doctrine.**

Next, Count III of Plaintiffs' complaint asserts a claim under § 1983 that the Defendant police officers conspired among themselves to violate Plaintiffs' federal constitutional rights. In their present motion, Defendants challenge this conspiracy claim as lacking support in the evidentiary record, and as barred by the intra-corporate conspiracy doctrine that the Sixth Circuit has invoked under circumstances similar to those presented here. The Court agrees with the latter of these arguments, and thus need not address Defendants' evidentiary challenge to Plaintiffs' § 1983 conspiracy claim.

In *Hull v. Cuyahoga Valley Joint Vocational School District Board of Education,*

926 F.2d 505, 509-10 (6th Cir. 1991), the Sixth Circuit addressed a claim that a school district superintendent, the school district's executive director, and a school administrator conspired among themselves in violation of 42 U.S.C. § 1985(3) to deprive the plaintiff of her federal constitutional rights on account of her race. The court noted that under the intra-corporate conspiracy doctrine as applied in prior civil conspiracy cases, it had been recognized that "a corporation cannot conspire with its own agents or employees." *Hull,* 926 F.2d at 509. Upon concluding that this doctrine should apply as well to allegations of conspiracy in violation of the federal Civil Rights Act, the court found that the plaintiff could not sustain a conspiracy claim against the three defendant school officials, "all of whom [we]re employees or agents of" the defendant board of education. *Hull,* 926 F.2d at 509-10. The court explained that "[s]ince all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy." 926 F.2d at 510.

The ruling in *Hull* has been applied in a number of more recent cases where, as here, the plaintiff alleged that a number of defendants who worked for the same governmental entity violated § 1983 by conspiring among themselves to abridge the plaintiff's federal constitutional rights. In *Upton v. City of Royal Oak,* No. 10-2304, 492 F. App'x 492, 493, 503 (6th Cir. May 11, 2012), for example, the plaintiff alleged that the defendant city and city officials had conspired with one another to terminate his employment as a firefighter in retaliation against his constitutionally protected speech and political activities. The district court held that the plaintiff's conspiracy claim was barred

34

by the intra-corporate conspiracy doctrine because all of the individual defendants were

employees or agents of the defendant city, and the Sixth Circuit affirmed, explaining that

"we find this case indistinguishable from *Hull.*"  *Upton,* 492 F. App'x at 506-07; *see also*

*Pardi v. County of Wayne,* No. 12-12063, 2013 WL 1011280, at *14-*15 (E.D. Mich.

Mar. 14, 2013) (dismissing the plaintiff's § 1983 claim of conspiracy under the intra-

corporate conspiracy doctrine, where all of the individual defendants were employees or

agents of the defendant county); *Mauldin v. Napolitano,* No. 12-10114, 2012 WL

2870834, at *5 (E.D. Mich. July 12, 2012) (finding that the plaintiff's request to amend

his complaint to assert a claim of conspiracy was futile, where "the only individuals who

are alleged to have conspired against Plaintiff were employees of the Department of

Homeland Security" who "could not form a conspiracy" among themselves).[15]

Under the uniform weight of this case law, the Court readily concludes that

Plaintiffs' § 1983 claim of conspiracy is defeated by the intra-corporate conspiracy

doctrine.  Because each of the individual Defendant police officers named in Plaintiffs'

complaint is employed by the same governmental entity, and because Plaintiffs have

---

[15]To be sure, the Sixth Circuit has recognized that an employer and its individual employees may form a conspiracy if the employees are not performing "collaborative acts done in pursuit of [their] employer's business," but instead are "act[ing] outside the course of their employment."  *Johnson v. Hills & Dales General Hospital,* 40 F.3d 837, 840-41 (6th Cir. 1994). In this case, however, Plaintiffs have expressly alleged that each of the individual Defendant police officers was acting "within the course and scope of his employment at all times" during the events referenced in the complaint.  (Complaint at ¶¶ 3-11.)  Likewise, there is no evidence in the record that any of the Defendant officers might have been off duty, engaged in activities outside the scope of ordinary law enforcement, or acting in furtherance of a personal agenda during the incidents giving rise to this suit.

35

expressly alleged that these officers were acting within the scope of their employment, the law deems the Defendant officers incapable of conspiring among themselves to violate Plaintiffs' federal constitutional rights.  Plaintiffs do not contend otherwise in their response to Defendants' motion; indeed, they do not even acknowledge Defendants' appeal to the intra-corporate conspiracy doctrine, much less endeavor to explain why this doctrine should not apply here.  Accordingly, the Court finds that Defendants are entitled to an award of summary judgment in their favor on Plaintiffs' § 1983 claim of a conspiracy to violate their federal constitutional rights.[16]

---

[16]In their summary judgment briefing, the parties appear to address a putative federal § 1983 claim of malicious prosecution in violation of the Fourth Amendment.  (*See* Defendants' Motion, Br. in Support at 28-29; Plaintiffs' Response Br. at 31-32.)  Yet, while Plaintiffs' underlying complaint evidently asserts a state-law claim of malicious prosecution, (*see* Complaint, Count VII), the only three federal § 1983 claims explicitly asserted against the individual Defendant police officers are for unlawful entry, excessive force, and conspiracy to violate Plaintiffs' civil rights, (*see id.,* Counts I-III).

Against this backdrop, the Court is somewhat at a loss as to whether Plaintiffs actually mean to assert a federal § 1983 claim of malicious prosecution.  The Court declines to resolve this question at this juncture, however, because the arguments put forward by Defendants and Plaintiffs on this possible claim are extremely terse and wholly skeletal in nature.  Most notably, Defendants baldly assert, without any discussion of the record or supporting explanation, that "none of the [police] reports submitted to the prosecutor in support of the [arrest] warrant request contained false statements."  (Defendants' Motion, Br. in Support at 29.)  Yet, these police reports include statements — *e.g.,* that the officers heard "screaming coming from the apartment" as they approached Plaintiffs' residence, that Mr. Wright "screamed" and "yelled" at the officers and was "extremely agitated" in response to the officers' request that they be allowed to enter the home, and that Mr. Wright "actively resist[ed]" in response to the officers' command that he put his hands behind his back, (Defendants' Motion, Ex. 2, Police Report at 5, 7) — that are contradicted by Plaintiffs' testimony and remain in dispute.  Thus, it cannot be said as a matter of law that the police reports prepared by Officers Kollman and Weise lacked any misstatements or falsehoods that might have played a role in the prosecutor's decision to charge Mr. Wright with resisting and obstructing a police officer.  *See Sykes v. Anderson,* 625 F.3d 294, 314-17 (6th Cir. 2010) (discussing the standards for demonstrating that a police officer's investigative materials played a sufficient role in a subsequent decision to prosecute to hold the

36

**E.     Plaintiffs Have Failed to Identify a Basis for Holding the Defendant Township Liable Under 42 U.S.C. § 1983 for Any Alleged Violation of Their Federal Constitutional Rights.**

Apart from their federal § 1983 claims asserted against the individual Defendant officers, Plaintiffs also have asserted a § 1983 claim against the Defendant Township, alleging that this governmental entity is subject to liability for the excessive force allegedly inflicted upon Mr. Wright and for the allegedly unlawful entry into Plaintiffs' home. Through their present motion, Defendants argue that Plaintiffs have failed as a matter of law to produce evidence that would support the imposition of liability on the Defendant Township under § 1983. The Court agrees.

It is well-established that the Defendant Township "cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents." *Gregory v. Shelby County,* 220 F.3d 433, 441 (6th Cir. 2000) (citing *Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978)). Instead, "[f]or liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort." *Gregory,* 220 F.3d at 441. Moreover, Plaintiff must establish that "through its deliberate conduct, the municipality was the 'moving force' behind" the violation of his constitutional rights — that is, he "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Gregory,* 220 F.3d at 442

---

officer liable for malicious prosecution in violation of the Fourth Amendment).

37

(quoting *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 405, 117 S. Ct. 1382, 1389 (1997)).

In this case, Plaintiffs seek to establish the requisite governmental policy or custom by asserting that the individual Defendant officers were inadequately trained and supervised.  As to the first of these contentions, the Supreme Court has recognized that a local governmental unit, such as the Defendant Township here, may be subject to § 1983 liability under a "failure to train" theory.  *See City of Canton v. Harris,* 489 U.S. 378, 388, 109 S. Ct. 1197, 1204 (1989).  The Court further emphasized, however, that this theory can succeed "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants."  *City of Canton,* 489 U.S. at 389, 109 S. Ct. at 1205.  This standard, in turn, can be met by showing that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  489 U.S. at 390, 109 S. Ct. at 1205. Finally, the Court stated that "for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." 489 U.S. at 391, 109 S. Ct. at 1206.

The record in this case fails to support Plaintiffs' claim of inadequate training.  As evidence of the Defendant officers' purported lack of training, Plaintiffs point to the testimony of two supervising officers, Sergeants Harshberger and Tschudin, that the

38

Defendant Township lacks a written policy as to when an officer may enter a private home without a warrant.  (*See* Plaintiffs' Response, Ex. J, Tschudin Dep. at 92-93; Ex. L, Harshberger Dep. at 64.)  Plaintiffs further cite Officer Weise's testimony that the Township has no written policy as to how many times an individual can be tased.  (Weise Dep. at 75.)  Yet, the absence of written policies on these particular subjects says nothing about whether the Township's officers are ***trained*** on such matters as warrantless entry into a private home and the appropriate use of force on a suspect.  And, in fact, Officer Weise testified that the Township does have a written policy, the "Use of Force Continuum," that governs the amount of force to be used on suspects and detainees, and that he has received training on the amount of force that is permissible under the Fourth Amendment.  (*See id.* at 41-45; *see also* Defendants' Motion, Ex. 10, Tschudin Dep. at 29 (referencing the Township's policy governing the use of force).)

Next, Plaintiffs seek to raise an inference that the Defendant officers were inadequately trained by pointing to Officer Weise's unwillingness at his deposition to provide a definition of probable cause, as well as his testimony that he did not know the difference between the Bloomfield Township ordinance and the Michigan laws that prohibit resisting and obstructing a police officer.  (*See* Weise Dep. at 46, 76.)  Even assuming, however, that the state of Officer Weise's knowledge on these subjects is relevant here,[17] Plaintiffs do not suggest how this testimony, by itself, could permit the

_____

[17]This is a dubious assumption, where the lawfulness of the entry into Plaintiffs' apartment turns on the issue of exigent circumstances, rather than the existence of probable

conclusion that the need for additional or better training was obvious, or that the existing training regimen was likely to result in the constitutional violations alleged here — *i.e.,* an unlawful warrantless entry or the use of excessive force. *See Miller v. Calhoun County,* 408 F.3d 803, 816 (6th Cir. 2005) ("Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability."). Most notably, Plaintiffs have not produced evidence of any prior incidents that might have alerted the Defendant Township to the need to reassess its programs for training its officers in warrantless entries or the proper use of force. *See Plinton v. County of Summit,* 540 F.3d 459, 464 (6th Cir. 2008) (citing evidence of prior instances of unconstitutional conduct as the ordinary means by which a plaintiff may satisfy the deliberate indifference standard for municipal liability). Accordingly, Plaintiffs have failed to identify any basis in the record for holding the Defendant Township liable under a "failure to train" theory.

Plaintiffs' second theory of municipal liability is that the Defendant officers were inadequately supervised, but this assertion, too, lacks support in the evidentiary record. Plaintiffs' claim of inadequate supervision rests entirely on Officer Kollman's testimony that no commanders asked him about the incident giving rise to this suit, and that, to his knowledge, there was no internal investigation of this incident. (Kollman Dep. at 37-38.)

---

cause, and where Officer Weise's knowledge as to the precise elements of a resisting and obstructing offense under a Bloomfield Township ordinance versus a Michigan statute has little or no evident bearing upon the reasonableness of the amount of force he and Officer Kollman used to restrain Mr. Wright upon entering Plaintiffs' residence.

Yet, Officer Kollman further testified that he informed a supervising officer at the scene, Sergeant Tschudin, about the events leading up to Mr. Wright's arrest, and that he advised Sergeant Tschudin of his plan going forward.  (*See id.* at 29-30; *see also* Tschudin Dep. at 55-56 (confirming this discussion on the scene).)  Similarly, another supervising officer, Sergeant Harshberger, testified that he spoke to Officers Kollman and Weise upon their return to the police station following the incident at Plaintiffs' apartment, with the officers describing this incident in detail and informing Sergeant Harshberger of their use of knee strikes and a taser to secure Mr. Wright's compliance with their commands.  (*See* Defendants' Motion, Ex. 11, Harshberger Dep. at 44-47.) Finally, Defendants have provided a copy of the use of force report prepared by Officer Weise with regard to the incident at Plaintiffs' home, and Sergeant Harshberger reviewed and signed this report.  (*See* Defendants' Motion, Ex. 12, Use of Force Report; *see also* Harshberger Dep. at 55.)  This record refutes Plaintiffs' assertion that the Defendant Township "fail[ed] to review its officers' conduct," (Plaintiffs' Response Br. at 34), in connection with the warrantless entry into Plaintiffs' home and the use of force on Mr. Wright.

In any event, even assuming that this record could be construed as indicating that the Defendant Township could or should have undertaken more thorough or rigorous supervision of its officers, Plaintiffs have failed to identify any evidentiary basis for the further, legally mandated conclusion that the Defendant Township's supervision of its officers was so deficient as to demonstrate the Township's deliberate indifference to the

41

constitutional rights of its citizens.  *See Ellis ex rel. Pendergrass v. Cleveland Municipal School District,* 455 F.3d 690, 700 (6th Cir. 2006).  In particular, Plaintiffs have not produced any evidence that the Defendant Township was on notice of past misconduct by its officers — much less forms of misconduct similar to those claimed by Plaintiffs here — such that the Township would have been aware of the need for additional or closer supervision.  *See Shirley v. City of Eastpointe,* No. 11-14297, 2013 WL 4666890, at *12 (E.D. Mich. Aug. 13, 2013) (distinguishing the case cited by Plaintiffs, *Kammeyer v. City of Sharonville,* No. 01-00649, 2006 WL 1133241 (S.D. Ohio Apr. 26, 2006), on this ground); *Marcilis v. Redford Township,* 757 F. Supp.2d 663, 682 (E.D. Mich. 2010) (same).  Accordingly, the Court finds that Plaintiffs' "failure to supervise" theory of liability against the Defendant Township, like their "failure to train" theory, lacks support in the evidentiary record.

**F.     Issues of Fact Remain as to Plaintiffs' State-Law Claims of Assault and Battery, False Arrest/False Imprisonment, and Malicious Prosecution.**

Finally, in Counts V through X of their complaint, Plaintiffs have asserted the state-law claims of (i) assault and battery, (ii) false arrest/false imprisonment, (iii) malicious prosecution, (iv) intentional infliction of emotional distress, (v) gross negligence, and (vi) loss of consortium.  In their response to Defendants' summary judgment motion, Plaintiffs state that they are no longer pursuing their claim of gross negligence, nor do they seek to recover from the Defendant Township under any of their state-law theories.  In addition, Plaintiffs' loss of consortium claim is subject to dismissal,

42

by virtue of the Court's entry of a January 14, 2014 stipulated order dismissing all claims brought by Plaintiff Marquetta Wright.  Accordingly, the Court need only address Plaintiffs' claims of assault and battery, false arrest/false imprisonment, malicious prosecution, and intentional infliction of emotional distress as brought against the individual Defendant officers.

The Defendant officers' principal challenge to these state-law intentional tort claims is that they are barred by the governmental immunity conferred under Michigan law.  In particular, under Michigan's Governmental Tort Liability Act ("GTLA") as construed by the Michigan Supreme Court, the individual Defendant officers are immune from liability under the four intentional tort theories asserted in Plaintiffs' complaint if, among other elements, their actions "were undertaken in good faith, or were not undertaken with malice."  *Odom v. Wayne County,* 482 Mich. 459, 760 N.W.2d 217, 228 (2008).  In contrast to the objective standard of reasonableness that governs a qualified immunity inquiry under § 1983, the good faith standard under Michigan's governmental immunity law is "subjective, not objective."  *Romo v. Largen,* 723 F.3d 670, 677 (6th Cir. 2013); *see also Cohn v. DeWeese,* No. 09-12187, 2010 WL 3906227, at *21 (E.D. Mich. Sept. 30, 2010).  Nonetheless, both the Sixth Circuit and this Court have recognized that "[t]he question of an officer's good faith under Michigan law overlaps considerably, if not entirely, with [the federal qualified immunity] analysis of whether the officer's actions were objectively reasonable under the circumstances."  *Malory v. Whiting,* No. 11-1468, 489 F. App'x 78, 86 (6th Cir. July 13, 2012); *see also Cohn,* 2010 WL 3906227

43

at *21-*22.  In addition, it bears emphasis that under Michigan law, the proponent of governmental immunity has the burden of establishing that he acted without malice.  *See Odom,* 760 N.W.2d at 225.

For essentially the same reasons already addressed in connection with Plaintiffs' § 1983 claim of excessive force, the Court finds that issues of fact remain as to whether Officers Kollman and Weise acted in good faith as they detained Mr. Wright in his apartment and used force against Mr. Wright in aid of this effort.  In particular, Defendants' claim of good faith rests upon the premise that Officers Kollman and Weise "repeatedly asked [Mr. Wright] to submit to handcuffing" and "warned [Mr. Wright] that he would be subjected to the Taser if he did not submit to handcuffing."  (Defendants' Motion, Br. in Support at 33.)  Yet, as discussed earlier, Mr. Wright testified that the Defendant officers never ordered him to put his hands behind his back, and he denied that he resisted any efforts by the officers to bring his hands behind his back so that he could be handcuffed.  This record gives rise to issues of fact as to whether Mr. Wright actively resisted the officers' lawful efforts to subdue and handcuff him, and these outstanding factual questions preclude a finding as a matter of law that Officers Kollman and Weise acted in good faith in their interactions with Mr. Wright in Plaintiffs' apartment.  *See Smith v. Stoneburner,* 716 F.3d 926, 934-35 (6th Cir. 2013); *Malory,* 489 F. App'x at 87.[18]

_____

[18]The Court notes that, just as there is no evidence to charge any Defendant officer other than Officers Kollman and Weise with liability under Plaintiffs' federal § 1983 claims of

Beyond this appeal to governmental immunity, Defendants mount a separate challenge aimed specifically at Plaintiffs' state-law claim of malicious prosecution, arguing that the Defendant police officers cannot be held liable under this theory in light of the "prosecutor's exercise of independent discretion in initiating and maintaining the prosecution [of Mr. Wright] for resisting and obstructing."  (Defendants' Motion, Br. in Support at 33.)  In the very case cited by Defendants in support of this contention, however, the Michigan Supreme Court recognized that such an appeal to a prosecutor's exercise of independent discretion is unavailing if the prosecutor acts on information provided by a third party that was "known by the giver to be false."  *Matthews v. Blue Cross & Blue Shield of Michigan,* 456 Mich. 365, 572 N.W.2d 603, 613 (1998).  Thus, both this Court and the Sixth Circuit have construed *Matthews* and the other pertinent Michigan case law as "confirm[ing] that a prosecutor's charging decision does not automatically insulate a police officer from liability for false statements in an incident report relied upon by the prosecutor."  *Strutz,* 308 F. Supp.2d at 787; *see also Morningstar v. Worthy,* No. 09-1677, 454 F. App'x 391, 405 (6th Cir. Dec. 21, 2011) (explaining that under Michigan law, including the decision in *Matthews,* a claim of malicious prosecution may rest upon a showing that a police officer "knowingly made false statements" in a police report "that formed the basis of [a prosecutor's] probable-

---

unlawful entry and excessive force, neither is there an evidentiary basis for Plaintiffs to pursue their state-law claims of assault and battery and false arrest/false imprisonment against any Defendant officers other than Officers Kollman and Weise.

cause determination").

As noted earlier, Plaintiffs challenge the truthfulness of a number of statements contained in the police reports prepared by Officers Kollman and Weise following their warrantless entry into Plaintiffs' apartment and their arrest of Mr. Wright. These reports state, for example, that the officers heard "screaming coming from the apartment" as they approached Plaintiffs' residence, that Mr. Wright "screamed" and "yelled" at the officers and was "extremely agitated" in response to the officers' request that they be allowed to enter the home, and that Mr. Wright "actively resist[ed]" in response to the officers' command that he put his hands behind his back. (*See* Defendants' Motion, Ex. 2, Police Report at 5, 7.) Each of these statements is contradicted by Plaintiffs' testimony and remains in dispute, and Defendants have produced no evidence that the prosecutor acted independently of these statements by Officers Kollman and Weise in determining that Mr. Wright should be charged with resisting and obstructing a police officer. In light of these outstanding questions of fact as to whether the prosecutor's charging decision was made in reliance on false statements found in the police reports of Officers Kollman and Weise, Plaintiffs' claim of malicious prosecution must be left for the trier of fact to resolve.[19]

Finally, the Court turns to Plaintiffs' claim of intentional infliction of emotional distress. The Michigan Supreme Court "has not officially recognized" this tort, but

---

[19]Once again, the Court notes that there is no evidentiary basis for charging any Defendant officer other than Officers Kollman and Weise with liability for the allegedly malicious prosecution of Mr. Wright.

46

"[a]ssuming that the cause is valid," a plaintiff must show "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Vanvorous v. Burmeister,* 262 Mich. App. 467, 687 N.W.2d 132, 141-42 (2004) (internal quotation marks and citations omitted). "Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Garretson v. City of Madison Heights,* 407 F.3d 789, 799 (6th Cir. 2005) (internal quotation marks and citation omitted). "Liability will not be found for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities; rather, the case must be one in which the facts would arouse the resentment of an average member of the community against the actor, leading him to exclaim, 'Outrageous!'" *Garretson,* 407 F.3d at 799 (internal quotation marks and citations omitted).

Viewing the evidence in a light most favorable to Plaintiffs, the Court cannot say that a reasonable trier of fact could characterize the conduct of the Defendant officers in this case as extreme, outrageous, or utterly intolerable. Although the record, viewed in Plaintiffs' favor, establishes that Officers Kollman and Weise forced their way into Plaintiffs' apartment rather than seeking a less confrontational means to ascertain whether anyone in the home was injured or in need of medical attention, there is no evidence that the officers used an extreme degree of force or were unusually destructive in carrying out this warrantless entry. Likewise, while the record would support a finding that Officers

47

Kollman and Weise employed excessive force against Mr. Wright upon entering his apartment, the officers' knee strikes and taser stuns were relatively few in number and limited to the purpose of getting Mr. Wright down to the floor with his hands behind his back, and he declined their offer of medical attention after he had been subdued and placed in handcuffs.  More generally, Plaintiffs fail to cite any evidence of permanent property damage to their apartment, nor was any force used or injury inflicted on any occupant of the home other than Mr. Wright.[20]  Under this record, the Court finds that Defendants are entitled to an award of summary judgment in their favor on Plaintiffs' claim of intentional infliction of emotional distress.

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' September 30, 2013 motion for summary judgment (docket #22) is GRANTED IN PART, as to (i) Plaintiffs' federal and state-law claims against Defendant Bloomfield Township and individual Defendants Harshberger, Hess, Smith, Monkonnen, Monti, Tschudin, and Barker, (ii) Plaintiffs' federal 42 U.S.C. § 1983 claim of conspiracy, (iii) Plaintiffs' state-

---

[20]To be sure, the Court is troubled by Officer Kollman's decision to place a call to Children Protective Services ("CPS") following the incident in Plaintiffs' apartment, given his and Officer Weise's uniform testimony that they observed no evidence of domestic violence, abuse, or neglect upon their warrantless entry into Plaintiffs' home.  Nonetheless, CPS promptly determined that no action should be taken on Officer Kollman's report, and Mrs. Wright testified that she was not even aware that a report had been lodged with CPS until Mr. Wright's criminal defense attorney advised her that CPS had investigated the incident at her home.  (*See* M. Wright Dep. at 45-46.)  Thus, there is no evidence that Officer Kollman's problematic decision to contact CPS had any negative effects or lasting consequences.

law claim of intentional infliction of emotional distress, and (iv) Plaintiffs' state-law claim of gross negligence.  In addition, Plaintiffs' state-law claim of loss of consortium is DISMISSED pursuant to the Court's January 14, 2014 stipulated order dismissing the claims brought by Plaintiff Marquetta Wright.  In all other respects, Defendants' motion for summary judgment is DENIED.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  October 30, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 30, 2014, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135